Filed 7/6/22  Gelman v. Seven Seas Smoke House etc. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| DMITRY GELMAN, | B305908 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC666551) |
| v. | |
| SEVEN SEAS SMOKE HOUSE & CATERING SERVICE, INC., | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael B. Harwin, Judge.  Affirmed.

Law Offices of Michael J. Libman and Michael J. Libman for Plaintiff and Appellant.

Calendo Puckett Sheedy, Christopher M. Sheedy; Robie & Matthai and Kyle Kveton for Defendant and Respondent.

—————————————

Plaintiff Dmitry Gelman sued defendant Seven Seas Smoke House & Catering Service, Inc., for injuries following an automobile accident involving one of defendant's employees. The jury concluded that defendant's employee was negligent and his "negligence [was] a substantial factor in causing harm" to plaintiff. The jury awarded damages of $18,739 for past economic loss, which included medical expenses, $0 for future economic loss, $16,500 for pain and suffering, and $0 for future pain and suffering. The jury also found that plaintiff was not contributorily negligent. The trial court denied plaintiff's motion for a new trial or additur on the basis that the damages were insufficient, at a hearing where counsel was not present.

On appeal, plaintiff contends the jury's verdict is not supported by substantial evidence; the verdict is against the law because it failed to adequately compensate plaintiff; the trial court abused its discretion when it allowed an unqualified expert to testify; and the trial court erred when it denied plaintiff's motion for a new trial without a hearing. Finding no merit to these claims, we affirm.

## FACTS

The trial began January 27, 2020, and the jury returned its verdict February 5, 2020—just before the COVID-19 pandemic began.

### 1. Plaintiff's Evidence

On September 17, 2015, plaintiff and defendant's employee were involved in an automobile accident. Defendant's employee was parked on the side of the road, and as he pulled his van into traffic, plaintiff's Mercedes crashed into him. At the time of the collision, plaintiff was traveling approximately 20 to 25 miles per

hour, and defendant was slowly accelerating, moving less than 10 miles per hour.

Neurosurgeon Dr. Andrew Fox was plaintiff's treating physician and was also retained as an expert who reviewed all of plaintiff's medical records. Dr. Fox started treating plaintiff in June 2019, almost four years after the accident. When plaintiff first met with Dr. Fox, he complained about back and neck pain, and weakness and tingling in his left arm and left leg. Plaintiff reported that he developed symptoms soon after the accident and he did not have a history of back or neck problems. Plaintiff's medical records disclosed that he had "mild" neck pain in 2010 or 2012 that resolved with a trigger point injection, but no other prior neck or back issues. Trigger point injections are minimally invasive injections into muscles to help treat inflammation.

Before plaintiff was treated by Dr. Fox, he received treatment from other doctors. His treatment plan initially included chiropractic care, epidural steroid injections, and imaging studies. Plaintiff had the first MRI of his neck in December 2015. The MRI showed a disk bulge in plaintiff's cervical spine, deteriorating disc space between the vertebrae, which leads to narrowing of the "nerves exit" causing compression of the nerves. Plaintiff had also developed bone spurs in his cervical spine, "which form with time and age" from degeneration of the disc space in the spine. Dr. Fox admitted that it cannot be determined how old a disc bulge is from an MRI. Plaintiff also had an MRI of his lower back, which showed a disc bulge.

Plaintiff received his first epidural injections in May 2016, and had more over the next year. In total, he received three injections in his neck and three in his lower back before coming to Dr. Fox for treatment. Before seeking treatment with Dr. Fox,

3

plaintiff had consulted with two other neurosurgeons who recommended surgery. Because plaintiff was still complaining about pain after receiving conservative treatment, Dr. Fox recommended fusion surgeries for plaintiff's neck and lower back.

Subsequent MRI's showed that plaintiff's condition was worsening. Dr. Fox admitted that plaintiff suffered from degenerative disease in his spine, but believed that plaintiff's condition worsened because of the accident. Dr. Fox testified that one may have back and neck problems that are not symptomatic but are aggravated by a collision that causes symptoms to manifest. He opined that trauma, such as a collision, can "accelerate underlying degenerative conditions."

Dr. Fox had not found any MRI's of plaintiff's neck or back in plaintiff's medical records that predated the accident. There were also no records of trauma that could have caused plaintiff's back or neck problems to become symptomatic, other than the collision.

Dr. Fox performed a fusion surgery on plaintiff's cervical spine. The cost of the surgery was approximately $200,000. He opined that plaintiff was at risk of needing another cervical fusion surgery in the future. He opined that plaintiff would require fusion surgery on his lower back in the future, at a cost of $250,000 to $300,000.

On cross-examination, Dr. Fox testified that plaintiff reported on intake forms which he completed in June 2019 that he cannot sit or stand for more than 30 minutes at a time, or walk more than one block without pain.

Plaintiff's daughter testified that he was different after the accident. He could not perform his normal activities such as carrying heavy items at the store, doing chores around the house,

4

or preparing dinner for his family. Even riding in the car for family vacations was difficult for him. He could not go on rides at the amusement park, go skiing like he used to, or walk the family dog. He experienced "unbearable" pain after the accident. Plaintiff was still, at the time of trial, experiencing these limitations. The car accident affected the daughter's emotional bond with her father, whereas life had been "perfect" before the car accident.

Plaintiff is 51 years old. He testified that after the accident his life was not the same. The collision was like an "out-of-body" experience; he felt like he was flying. After the accident, he felt "shaken up" and grateful that he was still alive. The fire department responded to the accident and offered to take him to the hospital, but he declined. The tow truck towed his vehicle to his place of employment, and plaintiff finished his day at work. Plaintiff started to immediately feel pain in his neck, back, knees, and legs. He never had any injuries to his neck or back before the collision.

After the collision, plaintiff received chiropractic care and physical therapy, but did not get better. He was referred to a pain management doctor and received epidural injections in his neck. During this time, his neck was hurting more than his lower back, although he did have lower back pain. He eventually received injections in his back as well, and experienced some temporary relief. He later consulted with a neurosurgeon because he felt "paralyzed" on the left side and kept dropping things because of weakness in his hand. It was recommended that he receive back and neck surgery. Plaintiff incurred a total of $299,063.30 in medical bills, which he had not paid, but signed a lien promising to pay. When asked on cross-examination if he had paid his

medical bills, plaintiff responded, "No, not yet.  I'm hoping your clients will."

Plaintiff admitted to receiving chiropractic treatment *before* the accident for neck and back pain.  He denied that his current doctors diagnosed him with degenerative changes to his spine.

Plaintiff also admitted that he was involved in another car accident in 2017, where he "sideswiped" another car while merging lanes.  Plaintiff minimized the seriousness of that accident but admitted the woman whose car he struck believed it was a "severe" accident.  Plaintiff denied he was injured in that accident.

Dr. Fox was not aware that plaintiff had been involved in another car accident after the one at issue in this lawsuit when forming his opinions.

Dr. David Orlowski is a vocational rehabilitation counselor who testified as a life care expert for plaintiff, offering an opinion about plaintiff's future medical costs.  He spoke with plaintiff's pain management doctor and surgeon to form his opinion, and to calculate the future medical costs of their recommended treatment.  He also reviewed all of plaintiff's medical bills.  Based on the recommendations of plaintiff's doctors, Dr. Orlowski estimated plaintiff would require $ 3,197,624 in future surgeries, pain management, physical therapy, imaging studies, epidural injections, massage, acupuncture, and medications.  During his testimony, all of plaintiff's medical bills and expenses were published to the jury.

2.    **Defense Case**

Stephen Blewett testified as defendant's accident reconstruction expert that the vehicles were minimally damaged

6

in the accident, and plaintiff's airbag did not deploy, indicating that nominal forces were involved in the accident.

Dr. Tack Lam is a physician and mechanical engineer, and testified as a biomechanical expert. He opined that the accident was a "low-speed frontal impact" and that such accidents do not typically cause or aggravate disc herniations in the neck or low back. It takes a large amount of force to cause a herniation, and you would typically see bone fractures around the area of the herniation. An acute herniation caused by the collision would cause a great deal of immediate pain. Disc herniations can also be caused by degeneration, and wear and tear, without any trauma. Many of these herniations that occur slowly over time are not symptomatic.

Dr. Lam opined the mechanics of the accident would not cause a herniation or aggravate an existing one. The most common type of injury from an such an accident is minor muscle strain. Disc injury or aggravation of an existing herniation would cause immediate pain, which was inconsistent with plaintiff's symptoms following the accident because he went to work and completed his work day. Dr. Lam believed muscle strain was likely the only injury attributable to the accident.

Dr. Khyber Zaffarkhan testified that he is a rehabilitation physician, who performs minimally invasive spine surgeries. He also has a degree in accounting, and studied life care planning during his residency as a doctor. He testified that discharge planning for spinal cord injuries involves determining patients' need for future care, and that he completed course work in life care planning.

Dr. Zaffarkhan reviewed plaintiff's medical records and the reports generated by plaintiff's life care planning expert. He

opined that plaintiff's chiropractic care following the accident was reasonable. He did not believe the subsequent care was reasonable or necessary. Many of the services were billed at a rate far above what is usual or customary. He also opined the surgery was not necessary, and the cost was inflated. Usually, such surgeries cost $125,000. He opined that at most, plaintiff suffered a soft-tissue injury in the accident. He therefore disagreed that plaintiff required the care proposed in Dr. Orlowski's life care plan. Moreover, the cost of the care was grossly inflated.

Diagnostic radiologist Dr. David Karlin testified that he reviewed multiple MRI's performed on plaintiff, and opined that they showed degenerative changes to his spine that occurred over a long period of time. These were longstanding chronic changes to his spine, not caused by the accident. None of the imaging showed evidence of any trauma-induced injuries. The degenerative processes got worse over the course of the MRI's, between 2015 and 2019.

Dr. Gregory Thomas Heinen is board certified in orthopedic surgery and orthopedic sports medicine. He reviewed plaintiff's medical records, and examined plaintiff on June 15, 2018. He found that plaintiff had some mild neck tenderness, and "fairly good" range of motion. He did not find any clear evidence of nerve compression affecting his arms. There was some tenderness in plaintiff's lower back, but plaintiff had "pretty good motion" in his lower back and extremities, and no evidence of radiating pain down his leg. Plaintiff's medical records revealed that plaintiff made inconsistent reports to the various doctors he had visited.

The parties stipulated that a private investigator conducted surveillance of plaintiff on January 27, 2020, during the trial. The

investigator obtained a video of plaintiff riding on a scooter in his neighborhood. The video was played for the jury.

Dr. Heinen testified that he watched the video of plaintiff riding the electric motorized scooter, and was "astonished" that plaintiff could ride the scooter with the limitations he claimed. Any claim that it was painful to walk or move around was inconsistent with the video of plaintiff bending his legs, twisting, and riding over bumps, which required balance and strength.

Plaintiff testified that it was "horrible" that a detective followed him and took a video of him riding the scooter. Plaintiff was checking out the scooter for his son, because the scooter had just been repaired. The scooter was simple to ride, and plaintiff had taken pain medication before riding it. He was bending his knees to alleviate pain in his back.

### 3. Verdict and New Trial Motion

The jury returned a verdict on February 5, 2020, finding that defendant's employee was negligent and his "negligence [was] a substantial factor in causing harm" to plaintiff. The jury awarded damages of $18,739 for past economic loss, which included medical expenses, $0 for future economic losses, including medical expenses, $16,500 for past noneconomic loss (pain and suffering), and $0 for future noneconomic loss.

On March 13, 2020, plaintiff filed a notice of intention to move for a new trial. Then the COVID-19 pandemic began. Plaintiff filed the new trial motion on March 23, 2020, calendared for hearing on April 21, 2020. In the motion, plaintiff argued the damages were inadequate as a matter of law and not supported by substantial evidence, and sought additur, arguing the court should award plaintiff his past medical expenses of $299,063.30, "past general damages" of $200,000 to $250,000, and $200,000 for

9

future medical expenses.  Defendants did not file an opposition to the motion.

At a nonappearance case review hearing on April 16, 2020, the trial court issued its tentative ruling to deny plaintiff's motion for a new trial.  The court ordered there would be no oral argument at the April 21, 2020 hearing, and ordered that counsel not appear at the hearing.  On April 21, 2020, the court entered its minute order denying the motion.  The court found, as the jury had, that plaintiff and his witnesses lacked credibility regarding the need for additional treatment and pain and suffering, and that the verdict was within acceptable bounds.  "The plaintiff's testimony was sufficiently impeached by evidence presented by the defense which was NOT discussed in the Plaintiff's moving papers, but which the jury obviously found persuasive."

Judgment was entered on February 27, 2020.  This timely appeal followed.

## DISCUSSION

### 1.    Sufficiency of the Evidence

As he did in his motion for new trial, plaintiff in his opening brief discussed only the facts favorable to his case.  Despite the trial court having found plaintiff's testimony was impeached by defense evidence, plaintiff argues the "unimpeached" evidence supported only one outcome—that plaintiff be compensated for his surgery and associated pain and suffering—and that he be awarded damages for his future medical care and pain and suffering.  We are not persuaded.

Plaintiff's discussion of the evidence in his opening brief was limited almost entirely to the evidence favorable to him, and not the evidence that supports the jury's verdict.  Therefore, he has waived appellate review.  (Cal. Rules of

10

Court, rule 8.204(a)(2)(C) [an appellant must discuss all significant facts in its brief]; *Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881; *County of Solano v. Vallejo Redevelopment Agency* (1999) 75 Cal.App.4th 1262, 1274.)

On the merits, Code of Civil Procedure section 657 provides that "[a] new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision, nor upon the ground of excessive or inadequate damages, unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision." " 'An appellate court may interfere with that determination only . . . where the award is so out of proportion to the evidence that it shocks the conscience of the appellate court.' " (*Ajaxo, Inc. v. E*Trade Financial Corp.* (2020) 48 Cal.App.5th 129, 192.) We review the trial court's ruling on a new trial motion for abuse of discretion, deferring to the trial court's resolution of conflicts in the evidence. (*Whitlock v. Foster Wheeler, LLC (*2008) 160 Cal.App.4th 149, 159.)

Here, the jury's verdict does not shock the conscience. There were clear conflicts in the evidence, with defendant's experts opining that the force of the accident was insufficient to cause plaintiff's injuries, that his injuries were preexisting, and that only minimal soft tissue damage was attributable to the accident, requiring minor chiropractic treatment. There was also evidence that plaintiff was well enough to ride a scooter, which plainly contradicted plaintiff's claim that he required additional medical treatment. The jury was entitled to find that plaintiff and his daughter were not credible, and exaggerated plaintiff's injuries.

11

## 2. Verdict Is Not Against the Law

Plaintiff next argues the verdict is against the law because it did not fully compensate him for his injuries, including his pain and suffering. (See *Clifford v. Ruocco* (1952) 39 Cal.2d 327, 329 [a jury verdict which fails to compensate for pain and suffering is inadequate as a matter of law].)

Here, the jury *did* award pain and suffering damages commensurate with the minor injury the jury found attributable to this accident. This is not a case where the jury failed to compensate plaintiff for pain and suffering. As discussed, *ante*, the jury reasonably concluded that plaintiff's injuries caused by this collision were minor, notwithstanding the extensive treatment he received. Plainly, the jury concluded that those treatments were not necessitated by the accident, but instead by plaintiff's progressing preexisting degenerative condition.

## 3. Expert Testimony

Plaintiff argues the trial court abused its discretion when it allowed Dr. Zaffarkhan to testify as a life care specialist.

Plaintiff objected that defendant's proffered life care planning expert, Dr. Zaffarkhan, was not qualified. The objection was made on the eve of his testimony, even though counsel knew for months the defense intended to call Dr. Zaffarkhan to testify to his opinions about life care planning.

The court conducted an Evidence Code section 402 hearing to assess Dr. Zaffarkhan's qualifications. He testified he is a physician and spinal surgeon who completed coursework in life care planning, and took courses on medical billing. He also had discharge planning experience for patients with spinal cord injuries. He has previously qualified as a life care planning expert in more than 20 cases in California courts. On cross-examination,

he testified he was not a certified life care planner or economist. He is a physician and spinal surgeon. The court found Dr. Zaffarkhan was qualified to testify as a life care planner, finding plaintiff's objections went to the weight of his opinion, not its admissibility.

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. [Citation.] The qualification of a witness to testify as an expert is a matter within the sound discretion of the trial court and where there is no showing of a manifest abuse of such discretion the ruling will not be disturbed on appeal." (*Stevens v. Roman Catholic Bishop of Fresno* (1975) 49 Cal.App.3d 877, 882.)

The trial court did not abuse its discretion. The trial court reasonably concluded that Dr. Zaffarkhan's experience as a spinal surgeon with discharge planning, medical billing, and life care planning qualified him to offer expert opinions to rebut the life care plan about which plaintiff's expert, Dr. Orlowski, had opined.

4.     **Hearing on the New Trial Motion**

Plaintiff argues the court did not hold a hearing on the new trial motion as required by statute, because the parties were not permitted to attend the hearing.

Code of Civil Procedure section 661 provides, in pertinent part, that "[t]he motion for a new trial shall be heard and determined by the judge who presided at the trial. . . . Upon the expiration of the time to file counter-affidavits the clerk forthwith shall call the motion to the attention of the judge who presided at the trial . . . and such judge thereupon shall designate the time for oral argument, if any, to be had on said motion. Five (5) days'

13

notice by mail shall be given of such oral argument, if any, by the clerk to the respective parties."

While the court must hold a hearing on the motion for a new trial, it is not required to permit oral argument on the motion. (*Silver v. Schwartz* (1956) 142 Cal.App.2d 92, 96.)  The hearing was held on April 21, 2020, during the COVID-19 emergency.  On April 14, 2020, the Presiding Judge of the Los Angeles Superior Court issued a General Order providing that from April 17, 2020, until May 12, 2020, all courtrooms were to remain closed for judicial business except for certain time-sensitive essential functions, which did not include ruling on a motion for new trial.

We can discern no possible prejudice from the parties' exclusion from the hearing, since the court ordered that no oral argument would be considered.

## DISPOSITION

The judgment is affirmed.  Respondent may recover its costs on appeal.


GRIMES, J.


WE CONCUR:


STRATTON, P. J.


WILEY, J.


14